IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Cooper Tire & Rubber Co.,                    Case No. 3:05SC7063

            Plaintiff                        **SEALED CASE**

    v.                                       OPINION

Jason M. Shinn,

            Defendant

        This is a suit by a client, Cooper Tire & Rubber Company (Cooper Tire), against an attorney,

Jason Shinn, who, while previously employed by the Toledo, Ohio, law firm Cooper & Walinski,

worked on matters involving Cooper Tire. Cooper Tire alleges, *inter alia*, that Shinn has in his

possession (stored on the hard drive of his personal computer) and is wrongfully withholding

confidential materials belonging to Cooper Tire. Through this suit Cooper Tire seeks to gain access

to and extract any such materials from Shinn's computer.

        Cooper Tire alleges that, though Shinn has represented variously that he has no such

materials or does not believe he has such materials, there is a substantial likelihood that Shinn's

computer contains a substantial quantity of Cooper Tire-derived materials. This contention is based

on the results of a search by a computer forensics company, Kroll Ontrack, which has been

appointed to provide such services in this case. (11/25/05 Hearing Ex. 9 at 2).[1]

---
[1]

Further references to Exhibits are to exhibits introduced at a November 29, 2005, evidentiary
hearing conducted by the undersigned pursuant to Judge David A. Katz's order of reference for such
purpose.

The docket shows that the parties have submitted agreed orders which authorize access by Cooper Tire to the hard drive of Shinn's computer and extraction of its materials. (Docs. 22 [Agreement of Parties, filed 3/23/05]; 23 [Consent Order filed 3/23/05]; Doc. 5/2/05 [Agreed Order Appointing Special Master (Kroll Ontrack)]; 35 [Agreed Order filed 8/12/05]).

Presently pending before the Hon. David A. Katz, the Judge to whom this case is assigned, is a motion by Cooper Tire to enforce settlement agreements and for sanctions against Shinn. (Doc. 29).

On November 12, 2005, Shinn sent a letter to Judge Katz. That letter relayed that statements had been made by an attorney for Cooper Tire, Brad Hughes, that suggested that, due to the "relationship" shared between Judge Katz and another of Cooper Tire's attorneys, William M. Connelly, Shinn would not be able to "obtain a favorable outcome if [he] persisted in litigating the matter before this Court." (Ex. 3 at 1).

As stated in the November 12th letter:

> The comments at issue were made in a July 26, 2005, phone call with Cooper Tire's Porter, Wright, Morris & Arthur counsel [Hughes], Nate Lindall of Kroll Ontrack,[2] and myself. I was told that it was in my best interest to "listen" to Cooper Tire's counsel and accept the proposed settlement that was under discussion because I was not likely to obtain a favorable outcome before the Court because of Mr. Connelly's relationship with Judge [David] A. Katz. I was initially shocked to hear such an assertion and pushed Cooper Tire's counsel for clarification, which consisted of "you know what I mean."

(*Id*. at 1-2).

Shinn's letter stated that he would "expect nothing less from this Court than to simply determine whether such comments were made and whether there is any basis for  comments that

---

[2] Nathan Lindell is Ontrack's Project Manager for the work being undertaken pursuant to the May 2, 2005, Order appointing a Special Master. (11/29/05 Hearing Transcript at 166) ("Tr.").

because of Mr. Connelly's relationship with this Court it was in my best interest to accept Cooper Tire's proposed settlement." (*Id*. at 2).

Judge Katz referred this matter to me to conduct an evidentiary hearing to determine, as Shinn's November 12th letter asked, "whether such comments were made and where there is any basis [for such] comments." That hearing was held on November 29, 2005.

## Background

### 1. Generally

Judge Katz previously scheduled a hearing on Cooper Tire's motion to enforce and for sanctions for November 29, 2005. Shinn sent his November 12th letter to Judge Katz during a period in which the parties had begun negotiating a possible resolution of their disagreement as to how extraction of Cooper's materials from Shinn's computer would occur. Indeed, the day before Shinn sent the letter, the parties had a conference call to discuss such possible resolution, which would obviate the necessity for the November 29th hearing.

On November 13th, the day after Shinn sent the letter, he sent an e-mail captioned "Settlement Proposal in Response to 11-11-05 Conversation" to counsel for Cooper Tire. (Ex. 7). Attached to that email was a "proposed settlement" that Shinn wanted transmitted to the CEO and CFO of Cooper Tire.

The proposal Shinn wanted transmitted directly to those officials was password protected: it could not, therefore, be read by Cooper Tire's counsel to whom it had been e-mailed. Nonetheless, Shinn's e-mail stated that his proposal was "intended to be reviewed" by the designated officers and asked counsel to "have these gentlemen contact me . . . about reviewing the proposed settlement . . . by November 21, 2005."(*Id*.).

Cooper Tire's counsel notified Shinn that they would not take any action with regard to his proposed settlement because counsel could not read the password protected proposal. (Ex. 7). Shinn provided the password, and counsel were able to access the "proposed settlement."

Among other terms proposed by Shinn in the communication he wanted forwarded to Cooper Tire's CEO and CFO were an offer to accept $10,000 from Cooper Tire and withdrawal of "my request [as made in the November 12th letter to Judge Katz] to the Court to investigate statements made by Cooper Tire's attorneys regarding the improper influence of the trial proceeding." (Ex. 8, at 6-7). Shinn's proposal also demanded "clarification" that the statement attributed to Cooper Tire's attorney in the November 12th letter "was not intended to suggest any impropriety or wrongdoing" by Cooper Tire. He also insisted on "assurance" from Connelly that he had no improper "special relationship" with Judge Katz and that no "improper influence occurred." (*Id*. at 6).

Thus, Shinn sent the November 12th letter which has led to this proceeding at a time when the parties were discussing the possibility of reaching an agreement that would avoid the hearing scheduled for November 29, 2005, and likewise enable fulfillment of the prior agreed orders, so that Cooper Tire could extract its materials from Shinn's computer.

According to Cooper Tire, the "proposed settlement" of November 13th was not the first time Shinn demanded that Cooper pay him for agreeing to the protocol by which its materials would be, as previously agreed and ordered, extracted from his computer.

An earlier demand – for a payment of $100,000 – had, Cooper Tire contends, been communicated around 10:00 p.m. on June 29, 2005, by Shinn in an unsolicited phone call to Connelly. In addition to that demand, which Cooper Tire describes as extortionate, Cooper Tire

alleges that Shinn said to Connelly that the case would be a "street fight," both parties would "get hurt," and this "fucking case" had better be settled.

Immediately after receiving this call, Connelly called Hughes's office, and left a voice mail in which he reported Shinn's demand and statements. Shinn, while not disputing having made the call, disputes the allegation he used vulgarity and some of the other statements attributed to him by Connelly on that voice mail.

Shinn also made an earlier demand of $75,000 on Cooper. That demand followed Shinn's June 20, 2005, filing of an answer and counterclaim. That answer and counterclaim were submitted *pro se*, though Shinn was at the time represented by counsel.[3]

Aside from being filed improperly *pro se*, Shinn's answer and counterclaim were, Cooper Tire asserts, both untimely and in derogation of the settlement and orders previously entered on agreement between the parties.

In any event, after Shinn filed his *pro se* answer and counterclaim, his counsel filed a motion on June 24, 2005, for leave to withdraw. That motion stated that Shinn desired to represent himself. (Doc. 27).

---

[3]

As this Court is well aware, there is no right to so-called hybrid representation – i.e., to appear and make filings *pro se*, while represented by counsel. *See, e.g.*, *Jones v. Bradshaw*, 326 F.Supp. 2d 857 N.D. Ohio 2004) (Katz, J.). Shinn appears to have been unaware of this well-established doctrine until the undersigned called it to his attention at the November 29, 2005, hearing. (Tr. 238).

Judge Katz conducted a hearing on the motion to withdraw on June 30, 2005. Present were counsel for Cooper Tire and one of the attorneys for Shinn who were seeking leave to withdraw. Judge Katz granted the motion for leave to withdraw on July 1, 2005.[4]

The following day, July 1st, Cooper Tire filed its motion to enforce and for sanctions. The gravamen of that motion is that Shinn's answer and counterclaim violate a settlement that underlies the orders relating to extraction of Cooper Tire's materials from Shinn's computer, Shinn had obstructed enforcement of those orders, and had done so in bad faith, as evidenced by his June 29th phone call to Connelly.

Judge Katz set the motion to enforce and for sanctions for hearing on July 7, 2005. On July 5, 2005, that hearing was reset for August 11, 2005.

---

[4]

At the hearing on November 29, 2005, Shinn also claimed that Cooper Tire's counsel engaged in improper *ex parte* communications with Judge Katz at the conclusion of the June 29th hearing on his attorneys' motion for leave to withdraw.

At that time, and in the presence of Shinn's former counsel, Cooper Tire's counsel: 1) informed Judge Katz that they would be filing a motion to enforce a prior settlement agreement and seeking sanctions against Shinn; 2) outlined briefly its basis for filing such motion (namely, Shinn's *pro se* answer and counter-claim and the June 29, 2005, night-time telephone call to Connelly); 3) and expressed a desire to have the matter set promptly for hearing.

When Cooper Tire's counsel communicated this information to Judge Katz, the Judge had not granted the motion withdraw, though he had indicated an intent to grant the motion. Shinn's attorneys remained his counsel until entry of the order granting their motion. Thus, the communications were not *ex parte*.

Even if the communications were *ex parte*, they were not improper, as they related solely and exclusively to procedural matters – i.e., Cooper Tire's request for a hearing forthwith on its anticipated motion to enforce settlement and for sanctions. *See, e.g., Bland v. Graves*, 99 Ohio App. 3d 123, 137 (Ct. App. 1994).

Thus, when the July 26th phone conference leading to these proceedings occurred, Cooper Tire's motion to enforce and for sanctions, with its allegations about Shinn's June 29th phone call, was awaiting an August 11th hearing.

## 2. The July 26, 2005, Conversation

The participants in the July 26, 2005, conversation (which occurred by telephone) were Hughes, Shinn, and Lindell. Their conversation involved, at least in part (if not substantial part), an effort to resolve the dispute about implementing the retrieval orders without having to conduct the August 11th hearing.

Shinn testified at the November 29th hearing that Hughes during the July 26th conversation had asserted:

> that this settlement was in his client's best interests, that it was also in my best interests to accept the settlement, given the relationship that Bill Connelly had with the Court.
>
> My immediate response I believe was what in almost shock and disbelief at which point I didn't even wait for a response and I said are you telling me that Bill's relationship with the Court is going to affect the outcome of this litigation and that's why I should accept this settlement?
>
> At that point, Brad kind of paused and just back tracked a little bit and said, Jason, you know what I mean. I said no, I don't know what you mean. I'm asking you what did you mean by that comment.

(Unedited Realtime Transcript at 10) ("Tr.").

Hughes's account of the conversation differed. The parties, he related, were attempting to reach an agreement as to how best to implement the prior agreed retrieval orders, and to see if they could do so without holding the hearing scheduled for August 11th.

Hughes testified:

> at one point said to [Shinn], I'm trying to avoid a evidentiary hearing at which sanctions could be imposed against [Shinn and Shinn] told me that [he] did not see any basis for sanctions.

7

And I said, I do not think that Judge Katz will be impressed when he learns the details of [Shinn's] late night profanity ridden telephone call to Mr. Connelly at his private residence. And [Shinn] disputed on the telephone call that there was any basis for sanctions and [Shinn] disputed my characterization of the call.

* * * * *

But, to the best of my recollection, I did note to Mr. Shin when he disputed my characterization of his phone calls to Mr. Connelly, that Mr. Connelly was well-known to the Court and had been practicing there for quite sometime and I really felt that he would be a credible witness at the evidentiary hearing about this phone call to his own house.

* * * * *

I also recall Mr. Shin stopping me as he described I believe before and suggesting that that comment was improper. And I also recall in response to that saying to him, Jason, you know what I mean and then continuing to explain to him why I thought Mr. Connelly would be a credible witness at that proceeding.

* * * * *

I never state[d] [to] Mr. Shin that Mr. Connelly could improperly influence the tribunal. I had no basis to think that. This is the first matter I've ever worked on with Mr. Connelly.

(Tr. 147-50).

The third participant in the July 26th telephone conversation, Lindell of Kroll Ontrack, also

testified at the November 29th hearing. According to him:

[I]t's my recollection that something was brought up from Mr. Hu[gh]es. I don't remember verbatim, but I do remember Mr. Shinn bringing up the fact right after that was stated that basically to the extent that  there could be some type of relationship. I don't believe that that's what Mr. Hughes's was intending it to be interpreted as but I do recall Mr. Shinn actually bringing that up.

(Tr. at 167).

Lindell's examination and testimony continued:

And do you recall a reference being made to an attorney William Connelly?
A. I do.
Q. And do you recall what that reference was, what was said, to the best of your recollection, if you can  recall?
A. I cannot recall.
Q. Okay.
A. The only thing I can recall is what was said and something was said by Mr. Hughes and immediately then Mr. Shinn had brought to his attention what he

believed to have been a -- that suggesting that the parties – that one of the I'm not sure what everyone's role is but I believe that one of them must be an attorney and then a judge and that there possibly being a relationship between the two.

Q. Okay. And that was Mr. Shinn's reaction to whatever had been said?

A. Yes.

Q. Okay. And you recall what had been said prior to that or can't you recall?

A. Boy you know what? It's been six months since that was said and I didn't really document it.

(Tr. 168-69).

Then, when asked the following questions, Lindell responded:

Q. I understand that you just testified to your extent of your recollection. I'd just like to touch upon -- you mentioned that you made a statement about your belief about Mr. Hughes's intention. Can you elaborate on that?

A. I'm not -- I'm not sure of -- if he was -- if Mr. Hughes's was meaning it in a professional manner or more in a personal manner. And -- meaning that I believe that, you know, it was more in a conversation as opposed to being a direction that he was suggesting to, you know, to -- I'm not sure if that makes sense. As far as it being in casual conversation as opposed to it being more of a direction that he had thought you should -- that Mr. Shinn should take.

(Tr. 169).

At this point in Lindell's testimony, Shinn called his attention to a July 29, 2005, letter that he had sent to Connelly regarding his contention that Hughes had referenced Connelly's ability improperly to influence Judge Katz. (Ex. 2). Shinn had also copied Lindell with that letter.

On being asked by the undersigned if Shinn's letter to Connelly refreshed his recollection about the July 29th phone conversation, Lindell stated:

that there was some mention that would be accurate with the basis for the statements that are made in that paragraph and it would be, in fact, accurate.

THE COURT: Well, does it refresh your recollection as to what else might have been said, aside from what you've just testified to.

THE WITNESS: I would not be able to testify verbatim to what was said, but, yes.

THE COURT: Okay. So what is -- in light of what -- what is your present recollection, in light of what you've just read as to what may have been said, to the extent that you can recall? And if you can't, that's fine. But if you can, please let me know.

THE WITNESS:  I don't -- I don't recall -- I  do recall the fact that there could have been -- or that there was a suggestion of a relationship between Judge Katz and Mr. Connelly.  I don't recall him saying to listen to him.  But I do recall there abouting [sic] a suggestion of a relationship.
THE COURT:  Do you recall anything else.
THE WITNESS:  Not at this time.

(Tr. 174-75).

On being questioned by counsel for Cooper Tire, Lindell stated:

I don't remember verbatim what was stated.  I do recall there abouting [sic] some type of –, in other words, I don't remember what he said verbatim about there being any type of relationship there.  I do remember there abouting [sic] some type of way that you could draft from that conversation a relationship.  And then I do remember Mr. Shinn immediately then explaining that that would be an unethical thing to state and, you know, also mentioning the rule that it would break if that was, in fact, the case.  So I'm not sure if I need to recant what I had previously said or if that actually does make sense with what I previously stated.
BY MR. TRAFFORD:
Q.  Well, my question was:  Your reaction was that Mr. Hughes didn't intend what Mr. Shinn inferred; is that correct?
A.  Yes, I believe that to be true.
Q.  Okay.  And absent this July 29th letter, you don't have a recollection of what it was that Mr. Hughes said; is that right?
A.  That's correct, not verbatim.
Q.  And Mr. Shinn sent you this letter on July 29th; is that correct?
A.  That is correct.
Q.  And he sent you also a copy of his letter to Judge Katz on November 12th; is that right?
A.  Let me just double-check that to confirm that.
Q.  He might not have sent that letter by e-mail. I'm not sure.
A.  Yes, that's correct yeah I did not receive that file /PHA*EUL.[sic].
Q.  Did you receive a copy of it?
A.  I did.

(Tr. 178-79).

When asked whether he recalled any reference to the July 26th phone call from Shinn to

Connelly, Lindell stated,

I don't recall there being any type of conversation about that.
Q.  Is it possible there was such a conversation and you just don't recall it?

THE WITNESS: I believe that there – if there was – that doesn't mean that it did not happen. I believe that as I had stated before, there are a lot of matters where I don't – I'm not necessarily involved in everything that's involved with a case as far as where they're at with a case. I strictly am assisting and providing facts to either party.

* * * * *

A. So I'm not necessarily privy so what's – everything that's gone on with a case itself.

Q. Is it fair to say that you then wouldn't understand the context in which certain statements were made?

A. Yes, very fair to state that. And by saying that, I would imagine because I don't necessarily know what's – what something's been said I probably wouldn't document that either.

Q. With respect to what you recall of the discussion or the exchange about Mr. Shinn and Mr. Hughes in which Mr. Shinn took exception to what Mr. Hughes said, do you recall whether or not Mr. Hughes denied saying what Mr. Shinn accused him of?

A. I believe that Mr. Hughes at the time had stated that he was – that wasn't what he was meaning it to be interpreted as or that's not what – exactly what he was stating.

Q. Do you recall – this is similar to my question about the late night phone call. Do you recall any discussion about there being a request by Cooper Tire to impose sanctions on Mr. Shinn?

* * * * *

A. Do you – I don't – I don't recall any – anything about sanctions against Mr. Shinn.

Q. Is that the kind of discussion that could have occurred, but because you're not involved in other aspects of the case it wouldn't be something you tuned into?

A. It very well – that's very accurate to state and I will in the future be sure to listen in a little bit more carefully. However, typically, I am documenting and specifically taking tune of what's been said as it relates to the hard drive that we're being asked to look at.

Q. Your focus is the technical issues?

A. Exactly.

Q. And would it be fair to say that you've participated in a number of phone calls in which Mr. Hughes and Mr. Shinn have been involved?

A. Very much so, yes, that's correct.

Q. And is it fair to say that some of those calls have been difficult in terms of the relationship between the parties?

A. That's accurate.

Q. And –

A. Yes, that is accurate to state.

Q. And sometimes they get off into discussions that are not related to the technical issues with which you deal?

Q. Is it – is it your practice then, . . . at times to sort of tune out that other discussion that doesn't involve the issues that you're involved in?

A. That is accurate to state. I mean, as far as I would still be on the line but I wouldn't necessarily be taking notice or notes on what specifically is being discussed. At times when there is – when the phone call is going away from what the objective of the phone conversation is, there are times when I will attempt to, quote, unquote, be the referee between the two parties to try to redirect them back to what the objective is for the call. But I don't recall ever doing so. Possibly on one occasion.

(Tr. 180-84).

Mr. Lindell's testimony concluded:

Q. . . . with respect to the July 26th call, do you recall ever stepping away from earshot of the conversation?

A. No, I don't.

Q. Do you ever recall Mr. Hughes denying the – my response?

A. I don't recall him doing that.

Q. And you stated that, I believe, and correct me if I'm wrong, that you believe that Mr. Hughes didn't intend the message that was conveyed?

A. That's correct.

Q. How do you know what his intentions were?

A. I believe that after he had stated that he had said that's not necessarily what I'm saying, to the extent I don't believe that was verbatim what was stated. But I don't . . .

Q. Mr. Trafford asked you was it fair to say that you may not necessarily understand some of the legal context. Do you recall that question?

A. I do.

Q. What did you understand my response to Mr. Hughes's statement to mean?

A. That based on what had just been said that there was some type of violation, as far as in the legal ramifications.

(Tr.180-85).

## Discussion

12

The factual dispute Judge Katz asked me to resolve relates to the conflicting versions of what was said by Hughes on July 26th with reference to Connelly's alleged relationship and influence with Judge Katz. Shinn claims that Hughes specifically referenced Connelly's "relationship" with the court. Hughes says he did not make such reference, though he referred to Connelly's likely credibility were he and Shinn to testify differently about Shinn's June 29th night-time call to Connelly.

Shinn claims that his June 29th phone call to Connelly had nothing to do with the parties' July 26th discussions about settling "the case." Cooper Tire contends that, as a component of its July 1st motion to enforce and for sanctions, and as evidence of Shinn's bad faith, testimony about the June 29th late-night conversation would likely be presented at the August 11th hearing. Thus, in Cooper Tire's view, the credibility of the participants in that conversation (Shinn and Connelly), whose versions would differ, would be among the matters for Judge Katz to consider in adjudicating the motion to enforce and for sanctions.

I conclude that Hughes's version of his statements is more accurate and credible than Shinn's version.

Perhaps most importantly, Shinn was not a credible witness. He was at various times equivocal and evasive, and his answers were often off point and unpersuasively loquacious. His demeanor while testifying likewise did not instill confidence that he was testifying accurately.

Several other considerations corroborate this view of Shinn's testimony and account of the July 26th conversation, and lead to the same conclusion.

For example, Shinn indicated during the November 29th hearing that the parties have continuously been negotiating a settlement of the case, and the July 26th conversation was simply one part of those negotiations.

Cooper Tire and Hughes disagree and contend that the purpose of the July 26th conversation was to resolve differences as to how Kroll Ontrack's work was to be performed and completed.

Nothing in the record, aside from Shinn's self-serving self-description about settling the case, suggests that any discussions after entry on March 23, 2005, of the parties' agreement (Doc. 23) and Agreed Order (Doc. 24) have involved resolution of anything but the problems and proceedings attendant on implementing that order.

Shinn's persistent mis-characterization of the post-March 23rd negotiations casts a shadow over his credibility.

In addition, Shinn delayed more than three months before informing Judge Katz of the alleged ethical questions that, he claims, arise from the comments he attributes to Hughes.

Shinn does not appear to be one who, if he genuinely understood Hughes to be asserting that Connelly could influence the outcome of the case, would, in the vernacular, "let it ride." On the contrary, his conduct throughout these proceedings can fairly be described as aggressive.

I simply cannot believe that, if Hughes had said something about Connelly's relationship that even faintly suggested that such relationship would have an effect on Judge Katz, Shinn would have postponed informing the Judge and seeking appropriate relief.

If Hughes had in fact said something truly troublesome about Connelly's putative relationship with and influence over Judge Katz, it is also highly unlikely that Shinn would have

acceded to the August 12, 2005, entry of a further agreed order. His *post hoc* suggestion that he was fearful of Connelly's improper influence over the Judge is unpersuasive.

In any event, Shinn has not plausibly explained his delay in making his assertions to Judge Katz.

Shinn had, to be sure, claimed in a July 29, 2005, letter to Connelly that Hughes had alluded to a possibly improper relationship between Connelly and the Court. Rather than reciting that allusion verbatim, Shinn, however, merely told Connelly, that Hughes "made comments *to the effect* that because of the relationship you have with Judge Katz that I would not obtain a favorable outcome were I to litigate the above matter." (Ex. 2 at 1) (emphasis supplied). Thus, Shinn's earliest description of Hughes's alleged remark is qualified, equivocal, and imprecise.

Moreover, the day after sending his letter to Judge Katz, Shinn submitted his November 13th "proposed settlement" with its offer to retract the allegations in his letter in exchange for $10,000 and other consideration.

This, plus the timing of the November 12th letter – sent, as it was, as the parties were *in medias res* with negotiations about obviating a hearing on Cooper's motion to enforce and for sanctions – suggest strongly that the letter to Judge Katz was composed as a bargaining device to try to secure a favorable outcome in those negotiations.

The communication giving rise to this proceeding would, moreover, not be the first instance in which Shinn has made erroneous allegations of misconduct by other lawyers.

In his July 29th letter to Connelly, Shin stated that his concerns about Connelly's relationship with Judge Katz were "further substantiated by your affirmative choice to seek out Judge Katz as

the judge in this matter as opposed to complying with the normal assignment procedures for district court judges." (Ex. 2 at 1).

When questioned about that accusation at the November 29th hearing, Shinn stated that the "sentence has no bearing or is not accurate, I guess." When then asked, "You withdraw that accusation?" Shin responded, "Yeah, I mean there's no basis for it I came to realize that after it was made and it was made on a reasonable investigation but a misunderstood investigation." (Tr. 64).

When questioned by me about his basis for having made an accusation of what would have been, in my view, corruption[5] of the random case assignment process, Shinn refused to answer on the basis of the attorney-client privilege:

> THE WITNESS:  Again this information comes directly from former counsel based on the attorney-client privilege I'm going to refuse to answer. I have no problem going in camera for you to make a conclusion.
> THE COURT:  You made a public statement or a statement to third parties that the case assignment process had not been complied with.
> THE WITNESS:  True.
> THE COURT:  By Mr. Connelly.
> THE WITNESS:  True.

---

[5]

Shinn took "exception" (Tr. 164) to my observation that he had "made [an] allegation that in effect the process for case assignment had been corrupted by Mr. Connelly." (Tr. 163). That is, however, a term that the Sixth Circuit has used to describe manipulation of the random assignment of cases in a federal court. *Guercio v. Brody*, 911 F.2d 1179, 1181 (6th Cir. 1990) (Plaintiff "made various disclosures concerning corruption in the Bankruptcy Court . . . [including], for example, that the Bankruptcy Court's system of random case assignments was being manipulated.").

Other courts have noted the seriousness of allegations, similar to that made by Shinn about Connelly, of judge-shopping. *See generally Disability Advocates and Counseling Group, Inc. v. Betancourt*, 379 F.Supp. 2d 1343,1263-64 (S.D. Fla. 2005) (citing several cases, and noting, *inter alia*, "contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice" and "attempts to manipulate the random assignment of judges .  .  . constitute[s] a disruption of the orderly administration of justice" that can "undermine public confidence in the assignment process" and "deprive litigants of their right to a fair hearing and contravene basic principles of due process") (citations and internal quotations omitted).

(Tr. 63).

From Shinn's response, it appears that something his attorney may have said suggested misconduct on Connelly's part. Before an attorney accuses another attorney of misconduct as serious as tampering with random case assignment, that attorney has a duty to make certain of his facts. Here, though, Shinn on his own admission made his accusation without, by belated hindsight, any basis for doing so.

This suggests that Shinn hears what he wants and understands it as he will, rather hearing what was said accurately, interpreting it objectively, and repeating it carefully.

Shinn's ability to perceive accurately is further undercut by what happened after he claimed that Joseph Thacker, a partner at Cooper & Walinski, had engaged in improper billing practices. The senior partners at the firm thoroughly investigated his allegations; they informed Shinn "the facts underlying the circumstances you described to us present no ethical violation." (Ex. 4).

As previously noted, *supra* note 4, Shinn also made misinformed and groundless accusations of improper *ex parte* contacts between counsel for Cooper Tire and Judge Katz. Here again, Shinn made very serious, but baseless allegations touching on the integrity of not just other counsel, but a Federal Judge as well.

An incident during the November 29th hearing casts some additional light on Shinn's inability to hear, interpret, and relate what others say and do accurately.

Robert Trafford, one of Cooper Tire's counsel and managing partner of the firm for which Hughes works, testified that Hughes was assigned to the litigation department (Tr. 114) and that his "practice is if not 100 percent litigation it's got to be 90 percent litigation" without, however, spending much time in courtrooms. (Tr. 115).

On thereafter calling Hughes as a witness, Shinn asked him, " you don't participate a lot in litigation – you don't do a lot of litigation?" (Tr. 136-37).

This question was based on a comment made by Hughes during a break in the November 29th hearing. Hughes responded, "No, you asked me whether I did a lot of trial work and my interpretation is of trial work is as Mr. Trafford explained spending time in the courtroom." (Tr. 136-37).

It is clear that Shinn, in making this misdirected attempt to discredit Hughes's credibility as a witness, either misheard, misapprehended, or misconstrued what Hughes had said but a short while before. In asking his question of Hughes, he persisted, moreover, in acting on his misconception despite the fact that Trafford had just testified that Hughes did ninety percent litigation.

This incident was, in practical effect, demonstrative evidence of how Shinn can misperceive, misconstrue, and misrepresent facts, and make allegations – including sometimes very serious allegations – without a basis for doing so.

Even an accurate representation of past fact on his part was shown, on fuller explication, to have presented an incomplete, and thus inaccurate picture of overall circumstances.

Shinn's November 12th letter to Judge Katz alludes to his raising of "issues about the legal ethics" regarding Cooper & Walinski's billings of Cooper Tire. He told Judge Katz that an unnamed "senior attorney" and "my independent bar counsel agreed with my concerns" and related that he had asked the firm's board for an "independent' review of my concerns." (Ex. 3 at 3).

As already noted, Cooper & Walinski promptly and thoroughly investigated Shinn's accusations. But Shinn did not disclose that fact in his letter to Judge Katz. And, as also already

noted, that investigation concluded that there had been no ethical violations. Shinn likewise did not mention that fact in his recitation of his whistle-blowing at Cooper & Walinski.

Singly, the unfounded nature of Shinn's allegations of corruption [by Connelly], cheating [by Thacker], dishonesty [by Hughes], or judicial misconduct [by Judge Katz], or his having told part, but not all of a story [to Judge Katz] would encourage caution before accepting the veracity of his version of the July 26th conversation. Taken together, they make it impossible to believe that his account is accurate, reliable, or credible.

My conviction that Shinn's version is not to be credited is, moreover, and importantly, enhanced when his testimony is compared to that of Hughes.

As a witness, Hughes was forthright and unequivocal. He answered the questions put to him straightforwardly. Unlike Shinn, he did not equivocate or seek to evade, explain, or elaborate. His demeanor added to the credence otherwise found in the substance of his testimony.

The accuracy of Hughes's description of the context of the July 26th conversation – namely, a negotiation seeking to avoid a hearing on the motion to enforce and for sanctions – corroborates his testimony about the content of his statement to Shinn.

In view of what the parties were attempting to accomplish, I have no doubt that Hughes's reference to Connelly was a comment on Connelly's likely greater credibility on the issue of Shinn's June 29th phone call to him. Giving fair warning that Shinn was not likely to win a swearing contest with a lawyer of Connelly's experience and tenure is reasonable, and good, advice. This is especially so where an attorney is faced with the possibility of being found not to have complied with prior court orders, and being sanctioned if such finding were made. The risk of being found to be untruthful would increase the possibility of an award of sanctions.

It certainly was reasonable for Hughes to anticipate that testimony about the late-night phone call would be presented at the forthcoming hearing. Cooper Tire believes that Shinn has acted in egregious bad faith. Whether that belief is or is not well-founded is immaterial: what matters is that Hughes could assume that Cooper Tire would present any and all available evidence to support that contention. Part of the available evidence was Connelly's account of the late-night, allegedly profane and possibly threatening phone call.

Thus, in addition to questions of candor, forthrightness, and demeanor, all of which favor crediting Hughes's version over Shinn's, Hughes's version fits the objective facts of the record. Shinn's does not.

To be sure, Shinn's version of the July 26th conversation has some modest independent corroboration in Lindell's testimony about his recollection – to the extent he had any – about the July 26th conversation. Though recalling some reference to Connelly and the term relationship (Tr. 167, 172, 175, 178), Lindell made clear that his recollection was not verbatim. (Tr. 167, 175, 178, 179, 185). He also expressed the view that Hughes had not meant whatever he had said in the way that Shinn had interpreted it. (*Id.* 167-68).

Lindell's participation in the conversation was with regard to the technical matters of whatever the parties might be trying to work out to facilitate extraction of Cooper's materials from Shinn's computer. He indicated that his attention may not have been focused fully on other matters that Shinn and Hughes might have discussed. (Tr. 182-83).

To the extent that Lindell recalled some reference to Connelly's relationship with the Court, it is as likely as not that his recollection was affected by the fact that Shinn had sent copies to Lindell of his July 29th letter to Connelly and November 12th letter to Judge Katz. Those letters set forth

Shinn's version of the conversation. There is a distinct possibility that those communications, which include one sent shortly before the November 29th hearing, unconsciously affected Lindell's recollection.

In view of the overwhelming and compelling doubts I have about Shinn's credibility, Lindell's hazy and indistinct recollection of what may have been said is insufficient to overcome the effect of those doubts.

One final note: Shinn's November 12th letter to Judge Katz also asked for a determination whether there was "any basis" for comments that might suggest that Connelly had a special relationship with the Judge that could influence his rulings. (Ex. 3 at 2).

It is clear that there is no such basis.

When asked directly, "Have you ever attempted to improperly influence the proceedings in or the outcome of any case before Judge Katz?", Connelly gave an answer that was as succinct and forceful as it was persuasive: "No, and I wouldn't dare." (Tr. 199-200).

Connelly denied ever having said to Shinn, Hughes, or anyone that he "had the ability to improperly influence the proceedings or outcome in a case" or ever having "made a statement that, to [his] knowledge, could be reasonably interpreted by anyone to – to be that because of [his] relationship, [his] familiarity with Judge Katz, that [he] can improperly influence the proceedings in an outcome of a case." (Tr. 200).

When asked why he had not responded to Shinn's July 29th letter about the July 26th conversation, which also contained the accusation of tampering with the case assignment process, Connelly responded:

> I considered the allegations I had manipulated the filing selection of judges, and that
> was preposterous. I looked at the *ex parte* allegations and knew them to be false as

well. I did not have any personal knowledge of the conversation Brad Hughes had, but I lump them in the same credibility I attached to the other two allegations and felt no need for me to personally respond.

(Tr. 203).

When held to the light of Connelly's testimony and the record of these proceedings, Shinn's speculative and unfounded assertions about Connelly's ability to influence Judge Katz through some relationship with the Judge evaporate.

## Conclusion

I find, therefore, that: 1) Hughes made no representation to Shinn that Connelly had a relationship with Judge Katz that could preclude a favorable outcome if Shinn persisted in litigating this case; 2) Hughes's recounting of his statements is credible and accurate; 3) Shinn's version of Hughes's statements is neither accurate nor credible; and 4) there is no basis for any suggestion that Connelly has, or has claimed to have, the ability improperly to influence this Court or its decisions and judgments.

Having made the foregoing findings for the reasons expressed, this opinion and those findings are

Respectfully submitted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge